**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| SABATINO MAGLIONE, Individually and On Behalf of All Others Similarly Situated,<br><br>*Plaintiff*,<br><br>v.<br><br>FLUOR CORPORATION, DAVID E. CONSTABLE, JAMES R. BREUER, JOHN C. REGAN, and JOSEPH L. BRENNAN<br><br>*Defendants*. | Case No. 3:25-cv-02496-N<br><br>Hon. David C. Godbey<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**<u>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 6

III. PARTIES ..... 7

A. Lead Plaintiff ..... 7

B. Corporate Defendant ..... 7

C. Individual Defendants ..... 7

IV. SUMMARY OF THE FRAUD ..... 8

A. Fluor's Business and Applicable Accounting Standards ..... 8

B. Cost-Related Accounting Violations Leading Up to the Class Period ..... 10

C. Defendants Misrepresent the Finances of the Three Infrastructure Projects ..... 12

D. Defendants Misrepresent Fluor's Book-to-Burn Ratio ..... 16

E. Insider Sales and Executive Resignations ..... 17

V. THE TRUTH EMERGES ..... 18

VI. POST-CLASS PERIOD EVENTS ..... 21

VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ..... 22

A. Defendants' False and Misleading Statements Concerning the Three Infrastructure Projects ..... 23

1. February 18, 2025 ..... 23

2. April 2, 2025 ..... 26

3. May 2, 2025 ..... 28

B. Defendants' False and Misleading Statements Concerning Fluor's Book-To-Burn Ratio, Backlog ..... 35

1. February 18, 2025 ..... 35

2. April 2, 2025 ..... 36

3. May 2, 2025 ... 37

VIII. ADDITIONAL ALLEGATIONS OF SCIENTER ... 42

IX. ADDITIONAL LOSS CAUSATION ALLEGATIONS ... 54

X. INAPPLICABILITY OF STATUTORY SAFE HARBOR ... 57

XI. PRESUMPTION OF RELIANCE ... 58

XII. CLASS ACTION ALLEGATIONS ... 59

COUNT I Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants) ... 62

COUNT II Violation of Section 20(a) of the Exchange Act (Against the Individual Defendants) ... 64

COUNT III Violation of Section 10(b) and 20A of the Exchange Act and Rule 10b-5 Promulgated Thereunder for Insider Trading (Against Constable) ... 66

PRAYER FOR RELIEF ... 68

JURY TRIAL DEMANDED ... 68

Court-appointed Lead Plaintiff Jerome Glazer ("Lead Plaintiff" or "Plaintiff") brings this action on behalf of himself and all other persons and entities that purchased or otherwise acquired the common stock of Fluor Corporation ("Fluor" or the "Company") between February 18, 2025 and July 31, 2025, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Plaintiff seeks to recover damages caused by the Defendants' violations of federal securities laws and to pursue remedies under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. Plaintiff brings these claims against Fluor, its former Chief Executive Officer (CEO) David E. Constable ("Constable"), its CEO James R. Breuer ("Breuer"), its Chief Financial Officer (CFO) John C. Regan ("Regan"), and its former CFO Joseph L. Brennan ("Brennan") (collectively "Defendants").

Plaintiff alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, Lead Counsel's investigation to date, which included the review and analysis of, among other things: (a) regulatory filings made by Fluor with the United States Securities and Exchange Commission ("SEC"); (b) press releases and presentations issued and disseminated by the Company; (c) analyst and media reports concerning Fluor; (d) transcripts of Fluor's investor and analyst conference calls; (e) communications with knowledgeable individuals, including certain former employees of Fluor; (f) trading data for Fluor securities and related documents; and (g) other publicly available information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. Defendant Fluor, headquartered in Irving, Texas, provides engineering, procurement, and construction ("EPC") and project management services to customers globally.

The Company operates through three main segments: Urban Solutions, Energy Solutions, and Mission Solutions. Fluor's Urban Solutions segment accounted for the largest portion of the Company's revenue and profit throughout 2024 and 2025.

2. This class action lawsuit arises from a scheme whereby Fluor's seniormost executives misled investors as to two critical components of the Company's financial picture, artificially keeping shares aloft despite knowing that: (i) three non-reimbursable infrastructure projects in the Urban Solutions segments – meaning, as discussed below, that Fluor would not be reimbursed for additional costs incurred in connection with the projects – had experienced significant cost overruns due to issues including delays, subcontractor design errors, and price increases, despite misleadingly touting the Company's "reimbursable backlog"; and (ii) Fluor's customers were reducing their capital spending and were hesitant to spend in the current macroeconomic environment. Defendants' motivation for misleading the market was clear: they sought to – and did – capitalize on an elevated share price, both for the purposes of selling on non-public information and for aggrandizing their significant incentive compensation.

3. Throughout the Class Period, Defendants touted Fluor's financial prospects and failed to disclose the impending significant impact that three of Fluor's longstanding infrastructure projects – in the Company's largest segment, Urban Solutions – would have on the Company's financial performance.

4. During the Class Period, three major infrastructure projects – the Gordie Howe International Bridge ("Howe Bridge") connecting Detroit, Michigan with Windsor, Ontario, Canada, and the Interstate 635 Lyndon B. Johnson ("I-635") and Interstate 35E ("I-35") highways in Texas (collectively, the Howe Bridge, I-635, and I-35 are referred to herein as the "Three Infrastructure Projects") – were a critical part of the Company's most important business segment,

Urban Solutions. Unbeknownst to investors, these fixed price legacy projects were plagued with cost overruns stemming from subcontractor design errors, the related impact on the schedule, and increases in the price of labor and materials. Defendants concealed or downplayed these issues throughout the Class Period.

5. On February 18, 2025, the first day of the Class Period, Fluor provided financial guidance, forecasting, among other things, adjusted EBITDA of $575 million to $675 million for 2025 and estimating 2025 margins of 4% to 5% for the Urban Solutions segment.

6. The Company's guidance failed to account for the fact that each of the Three Infrastructure Projects was in or near a "loss position"; that is, the total estimated costs of finishing the project exceeded the revenues (the value of the contract) Fluor would receive for performing the work. Critically, and as discussed herein, applicable accounting standards require that when a project is in a loss position, any increase in the estimated total cost must be recognized as a charge to earnings in full and in the quarter when the new estimate is made. The loss must be recorded immediately and not spread over the balance of the term of the project.

7. This meant that Fluor's FY 2025 EBITDA guidance of $575 to $675 million could be jeopardized by any further cost development on any of the Three Infrastructure Projects. If costs increased beyond then-current estimates for any reason, Fluor would have to recognize that entire loss in that quarter.

8. As alleged herein, at the time that the Company issued its financial guidance for full year ("FY") 2025 on February 18, 2025, and again on May 2, 2025, when Defendants reaffirmed guidance, they were aware of factors affecting the Three Infrastructure Projects – delays, price escalation, subcontractor design failures, among others – that made increased costs,

and therefore a net impact in the upcoming quarter, increasingly likely. This undermined the reasonableness of the Company's guidance.

9. At the same time that Defendants were being less than candid with investors regarding the impact of the Three Infrastructure Projects on Fluor's financial picture, they were also misleading the market about the Company's backlog and its "book-to-burn" ratio (also referred to as "book-to-bill"), which is calculated by dividing new awards by revenue for the same period. As set forth herein, the book-to-burn ratio speaks to a company's backlog of new contracted work relative to the work it is completing. If that ratio exceeds 1.0, that indicates that the company's backlog is growing, as it is adding new work to its pipeline faster than it is completing old work.

10. Leading up to and throughout the Class Period, Defendants touted Fluor's book-to-burn ratio, pointing to it as a marker of growth. Indeed, throughout the Class Period, Defendants raised investor expectations by representing that Fluor's "assumptions include a new awards book-to-burn ratio above 1" and "we do see a book-to-bill significantly above 1 in 2025." Even when flagging potential headwinds to growth in terms of customer spending habits, Defendants downplayed the significance of those factors by failing to make a downward adjustment to the Company's book-to-bill ratio forecast.

11. On August 1, 2025, in connection with Fluor's Q2 2025 financial results and guidance, Defendants could no longer conceal the truth. Fluor's results for Q2 2025 included a reduction of its EBITDA guidance to $475 million to $525 million, a significant downward adjustment of 20% at the midpoint from Defendants' prior guidance of $575 million to $675 million, and adjusted EPS of $1.95 per share to $2.15 per share, down significantly – 18% at the

midpoint – from Defendants' prior guidance of $2.25 per share to $2.75 per share. Fluor's margin guidance for 2025 was reduced to 2.5% for the Urban Solutions segment.

12. Defendants attributed these results: (i) in part to the negative impact of the Three Infrastructure Projects, which precipitated a $54 million net impact for the quarter – specifically, "***[r]esults reflect a $54 million net impact of cost growth and expected recoveries on three infrastructure projects, due to subcontractor design errors, the related schedule impacts, and price escalation***"; and (ii) in part to concern over the backlog and decrease in customer spending – specifically, "***client hesitation around economic uncertainty and its impact on new awards and project delays and results for the quarter***." In other words, these disclosures were a clear departure from what Defendants had conveyed throughout the Class Period regarding the finances of the Three Infrastructure Projects and the Company's backlog, including its book-to-burn ratio. Far from the comfort of a "reimbursable backlog," as Defendants had touted, the Company's finances were vulnerable to cost overruns and trends in customer spending.

13. This news shocked the market. Following the foregoing disclosures, Fluor's stock price plummeted $15.35 per share, or 27.04%, to close at $41.42 per share on August 1, 2025.

14. By the time this news was revealed, Defendants Constable and Brennan had left their posts on the Fluor executive team. Defendant Constable left his role as CEO in April 2025, but not before offloading more than $11 million in Fluor shares – including more than $6 million in open market sales – at artificially inflated prices. He sold his Fluor shares while he was in possession of material non-public information and shortly before the truth of Defendants' false statements were revealed.

15. The Individual Defendants (defined herein) had actual knowledge of the issues with the Three Infrastructure Projects and the book-to-burn ratio. Their knowledge is plain based on

statements they made, as well their positions in the Company and knowledge of the industry. Further, three individuals who each worked day-to-day on one of the Three Infrastructure Projects have provided statements set forth herein that establish knowledge of these issues at the highest levels of Company management, including the Individual Defendants by detailing the periodic project reports – what information they contained, how frequently they were generated, and to whom they were conveyed.

16. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

17. The claims asserted in this Complaint arise under Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Fluor maintains its corporate headquarters in this District, Defendants conduct business in this District, and many of the acts and omissions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material fact, occurred and/or were directed in substantial part in this District.

20. In connection with the acts and omissions alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

21. Lead Plaintiff Jerome Glazer acquired Fluor common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein upon revelation of the corrective disclosures, as set forth in the certification previously filed with the Court (ECF Nos. 9-2, 9-4).

### B. Corporate Defendant

22. Defendant Fluor is a Delaware corporation with its principal executive offices located at 6700 Las Colinas Boulevard, Irving, Texas 75039. Fluor's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "FLR."

### C. Individual Defendants

23. Defendant Constable currently serves as Executive Chairman of Fluor's Board of Directors. Constable served as the Company's CEO from January 2021 through April 2025. He has been a director on Fluor's Board since 2019 and served as Executive Chairman since May 2022. He previously held various leadership roles within Fluor between 1982 and 2011, including group president roles leading Fluor's Project Operations business. Constable informed the Board on March 3, 2026 that he will not stand for reelection at the next annual meeting to be held on May 6, 2026 and will retire from Fluor as of that date.

24. Defendant Breuer has served as Fluor's CEO since May 1, 2025, before which he served as the Company's Chief Operating Officer (COO) since August 5, 2024. Prior to that, he served as Group President, Energy Solutions since January 2021. Defendant Breuer also held multiple other roles at Fluor throughout his thirty-one (31) years at the Company.

25. Defendant Regan has served as Fluor's CFO since March 1, 2025, before which he served as the Company's Chief Accounting Officer since June 22, 2020.

26. Defendant Brennan served as Fluor's CFO and Executive Vice President from July 22, 2020 until March 1, 2025.

27. Defendants Constable, Breuer, Regan, and Brennan are collectively referred to herein as the "Individual Defendants."

28. The Individual Defendants possessed the power and authority to control, and did in fact control, Fluor's public statements to the market, including in SEC filings, press releases, and presentations to securities analysts, investors, and the media. In their respective roles, the Individual Defendants were directly involved in preparing, reviewing, and approving the Company's public statements and disclosures to the market.

29. Because of their positions with Fluor, and their access to material information available to them but not available to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV. SUMMARY OF THE FRAUD

### A. Fluor's Business and Applicable Accounting Standards

30. Defendant Fluor provides engineering, procurement, and construction ("EPC"), fabrication and modularization, and project management services worldwide. The Company operates through three main segments: Urban Solutions, Energy Solutions, and Mission Solutions.

31. Throughout 2024 and 2025, Fluor's Urban Solutions segment accounted for the largest portion of the Company's revenue and profit.

32. The Urban Solutions segment offers EPC and project management services to a wide array of industries, including advanced technologies and manufacturing, life sciences, mining and metals, and infrastructure.

33. In preparing its financial reports and SEC filings for its infrastructure projects, Fluor applies ASC 606, *Revenue from Contracts with Customers*, which governs how revenue, costs, and anticipated losses are recognized over the life of a project.

34. The Company's 2025 Form 10-K includes Critical Accounting Policies and Estimates, which includes "*Revenue Recognition for Engineering & Construction Contracts*." Fluor explains in its 2024 and 2025 Form 10-Ks that it generally uses the cost-to-cost percentage-of-completion, which "measures progress towards completion based on the ratio of cost incurred to date compared to total estimated contract cost."

35. The cost-to-cost method creates sensitivity to changes in cost estimates. Adjustments to total estimated costs directly affect the percentage of completion and therefore the timing and amount of revenue recognized. Fluor describes in its 2024 and 2025 Form 10-Ks, "[i]f we estimate that a project will have costs in excess of revenue, we recognize the total loss in the period it is identified." This is consistent with ASC 605-35-25-45, which requires entities to recognize anticipated losses on contracts as soon as they become evident. When total estimated contract costs exceed total expected revenue, the entire projected loss must be recorded immediately in the income statement, regardless of the stage of completion. This requirement applies even when revenue is recognized over time under ASC 606. Importantly, loss recognition is based on the full contract not just the portion completed to date. This can result in significant write-downs if cost estimates deteriorate.

36. In order to make these estimates, Fluor describes that "the project team reviews information such as any outstanding key contract matters, progress towards completion and the related program schedule and identified risks and opportunities." Fluor's Form 10-Ks also explain that "[t]he accuracy of our revenue and profit recognition in a given period depends on the accuracy

of our project estimates, which can change from period to period due to a variety of factors," such as the productivity of labor, extent of changes to the design, performance of subcontractors, and the "[l]ength of time to complete the project."

37. The type of contract—fixed price versus reimbursable—has a major influence on both revenue recognition and loss exposure. Fixed price contracts concentrate risk on the contractor, making accurate estimation critical. Under ASC 606, revenue is still recognized over time if criteria are met, but any increase in estimated costs reduces margins and may trigger a full loss accrual under ASC 605-35. In contrast, reimbursable contracts generally have more predictable margins because allowable costs are reimbursed, and revenue often closely tracks costs incurred plus a fee. For example, if labor costs rise, Fluor would not have to pay the increased costs. These contracts reduce the likelihood of loss positions and typically involve fewer variable consideration constraints, simplifying revenue recognition.

38. Given the risk of significant losses on fixed price contracts, Defendants were focused on moving to reimbursable contracts. During the Class Period, a majority of Fluor's contracts were reimbursable. As Constable described on a February 18, 2025 earnings call, "[t]hrough our disciplined contract pursuits, 85% of new awards for 2024 were reimbursable, and our total ending backlog is now approximately 80% reimbursable." Critically, however, the Three Infrastructure Projects at the core of this lawsuit were non-reimbursable.

**B. Cost-Related Accounting Violations Leading Up to the Class Period**

39. Leading up to the Class Period, Fluor was investigated by the SEC for accounting improprieties in financial statements related to the treatment of costs on construction projects that occurred between 2016 and 2019.

40. On September 6, 2023, Fluor entered into a settlement with the SEC and paid a $14.5 million fine in a matter involving improper accounting for cost overruns on large

construction projects. *In the Matter of Fluor Corporation*, Administrative Proceeding File No. 3-21610, Securities Exchange Act of 1934 Release No. 98292 (Sept. 6, 2023). The SEC summarized Fluor's wrongful conduct as follows:

> This matter involves deficiencies in Fluor's accounting over a period of years for two fixed-price construction projects on which Fluor carried a risk of cost overruns with respect to work within the contract's scope. Fluor bid on these projects, relying on overly optimistic cost and timing estimates. Following each project's contract award, Fluor experienced cost overruns that worsened over time. Yet, Fluor failed to maintain a system of internal accounting controls sufficient to account for these contracts . . . . These failings resulted in inaccurate books and records and ultimately in materially misstated financial statements included in periodic reports filed with the SEC.

41. With respect to one of the two projects, the SEC described Fluor's conduct as follows:

> During the Relevant Period, the difference between the subcontract price and the anticipated total cost of the Radford Project grew significantly as delays and cost overruns worsened. The growing anticipated total costs over the subcontract price should have prompted Fluor to revise the EAC [Estimate at Completion] to reflect all the additional anticipated costs. Instead, Fluor improperly excluded certain such costs from the total cost estimate in the EAC. . . . As a result, Fluor's forecasted cost in the EAC remained artificially low and delayed loss recognition.
>
> * * *
>
> [T]he Radford Project was, in reality, operating at a loss. Fluor's improper exclusion of costs that were known or should have been known led to inaccurate books and records . . . . As a result . . . , Fluor materially misstated its net earnings in periodic reports filed with the SEC . . . .

42. Similarly, for the second of the two projects, the SEC stated: "The exclusion of costs that were known or should have been known from the forecast for the Penguins Project led to misstated books and records, and ultimately resulted in materially misstated financial statements."

### C. Defendants Misrepresent the Finances of the Three Infrastructure Projects

43. Fluor's Urban Solutions segment included three large-scale, long-standing infrastructure projects (previously defined collectively as the Three Infrastructure Projects) that are central to this action: the Howe Bridge, connecting Detroit, Michigan with Windsor, Ontario, Canada; I-635, the Interstate 635 Lyndon B. Johnson Highway in Texas; and the I-35 Highway in Texas. Defendant Breuer characterized all three as "long-standing infrastructure projects," and analysts and Defendants similarly referred to them as "legacy" projects.

44. Fluor broke ground on the Howe Bridge project on July 17, 2018 — more than six years before the start of the Class Period. The project is a public-private partnership to design, build, finance, operate, and maintain the bridge and associated ports of entry ("POE") connecting the United States and Canada. Fluor is a member of the joint venture consortium Bridging North America G.P. ("BNA") contracted to deliver the project by the Windsor-Detroit Bridge Authority ("WDBA").

45. By the start of the Class Period, the Howe Bridge project was already experiencing significant POE handover delays. An S&P Global Ratings report dated April 28, 2025 documented that Fluor had already missed the following milestone deadlines: (a) the Canadian POE agency building handover, scheduled for June 30, 2024; (b) the Canadian POE full handover, scheduled for September 20, 2024; and (c) the U.S. POE handover had been delayed 304 days. The report also noted that a "liquidated damages waiver agreement" had been negotiated between the consortium and WDBA, formally acknowledging a schedule failure. According to the report, the purported cause of the delays included labor shortages attributable to competing construction at the nearby Stellantis/LG battery plant. On the August 1, 2025 earnings call, Defendant Breuer acknowledged that there were delays and cost growth in Q2 2025 due to "rework and additional efforts required to hand over both ports of entry."

46. The I-635 project is a major highway reconstruction project in Texas with an original contract value of approximately $1.74 billion. On the August 1, 2025 earnings call, Defendant Breuer revealed that "the 635/LBJ project experienced cost increases in construction materials as well as labor productivity impacts."

47. The I-35 project is a highway construction project in Texas. Phase 2 of the project was ongoing during the Class Period. On the August 1, 2025 earnings call, Defendant Breuer revealed that "on I-35 Phase 2, the project experienced increased costs due to a subcontractor default, third-party utility delays and mitigation costs related to these delays."

48. As of February 18, 2025, Fluor asserted that the Howe Bridge project was 94% complete and "handover of the U.S. port of entry is in progress." Substantial completion of the Howe Bridge project was targeted for Q3 2025. On May 2, 2025, Fluor claimed that the Howe Bridge project was 96% complete "and we're on track to hand over the US port of entry in July, getting us closer to our completion date this fall."

49. As of February 18, 2025, the Company asserted that the I-635 project was 70% complete with "[s]ubstantial completion forecasted for Q2 of 2026."

50. On February 18, 2025, the first day of the Class Period, Fluor provided financial guidance for the full year of 2025, including adjusted EBITDA of $575 million to $675 million and adjusted earnings per share ("EPS") of $2.25 per share to $2.75 per share. Fluor also disclosed estimated margins for the Urban Solutions segment of 4% to 5%. Fluor reiterated this guidance in May 2025.

51. Notwithstanding the Company's guidance at the time, each of the Three Infrastructure Projects was in "loss position," meaning the total estimated cost to complete the project exceeded the total contract revenue the Company expected to receive. As described further

below, under applicable accounting standards (ASC 605-35-25-45), when a project is in a loss position, any increase in the estimated total cost must be recognized as a charge to earnings immediately and in full in the quarter when the new estimate is made. The loss cannot be spread over the remaining life of the project.

52. This accounting treatment meant that Defendants' FY 2025 EBITDA guidance of $575 to $675 million was asymmetrically vulnerable to any further cost growth on the three loss-position infrastructure projects. If costs increased beyond existing estimates — for example due to rework, material-cost escalation, subcontractor failures, or schedule delays — the entire incremental loss would hit earnings immediately in a single quarter.

53. Former Fluor employees and other individuals who worked on the Three Infrastructure Projects have provided statements which independently corroborate Defendants' scheme. Confidential Witness 1 ("CW1"),[1] a former Communications Manager and Project Liaison on the I-635 project employed by Fluor during a more than six-year tenure spanning from September 2019 through January 2026 – encompassing the full Class Period – noted that the I-635 Project experienced abnormally high turnover in terms of project managers. According to CW1, who reported to several other Communications Managers during her tenure, six different project managers were assigned to the I-635 Project over the life of the project. As CW1 explained, the high turnover was unusual for a project of this scale, and it contributed to, as CW1 described it, inconsistent direction and shifting priorities. The six different Project Managers assigned to the I-635 project included: Jason Estes, Larry Luke, Mike Lipinsky, Scott Risle, Steven Varnell, and Raul Malik.

---

[1] "CW" refers throughout to the confidential witnesses whose statements appear in this Complaint. In order to preserve the anonymity of each CW, the pronouns "they," "them," and "their" are used in reference to all CWs irrespective of their gender.

54. In addition, CW1 noted "design issues" with the I-635 Project, which played a "major role" in extensive, highly costly delays. This was the "first time [CW1 was] involved in a project that's delayed this long."

55. CW1 also stated that executives were aware of the financial effects when the I-635 project's completion extended past 2024 because delays of that magnitude can carry substantial financial consequences, which CW1 understood were acknowledged by Project Managers who interfaced with senior leadership.

56. CW1 further stated that they were instructed by Project Managers to continue messaging that the project remained active through 2024. They followed strict guidance on how information should be framed and who was authorized to speak on schedule-related matters. Schedule discussions were "highly politically sensitive."

57. CW1 stated that there were quarterly calls at the corporate executive level, and their supervisors participated in monthly board-style project meetings.

58. Likewise, as reported by CW2, a former Finance Coordinator on the Howe Bridge who was hired and supervised by Project Manager Josh Perry, Fluor management kept itself updated on the finances of the Three Infrastructure Projects. Indeed, according to this individual – whose tenure on the Howe Bridge spanned three and a half years, from October 2019 through April 2023 – members of Fluor's executive team routinely visited the site to view the progress of the project and review costs and the budget.

59. CW2 stated that Thomas Nilsson, the Infrastructure President, visited the Howe Bridge site monthly. According to CW2, Nilsson took at least two write downs on the Howe Bridge project during Nilsson's "brief" tenure, and that, as CW2 described it, Nilsson "wanted to wipe the slate clean."

60. CW2 further stated that the write-downs had to be approved by senior management at Fluor because they have to agree to take the loss by the end of the quarter. When asked if that meant the Fluor CFO knew of and approved each write-down, CW2 said yes.

**D. Defendants Misrepresent Fluor's Book-to-Burn Ratio**

61. In the engineering and construction industry, the "book-to-burn" ratio (also referred to as "book-to-bill") measures whether a company is winning new contracts faster than it is completing and billing existing work. "Book" refers to new contract awards in a given period. "Burn" refers to revenue recognized in the same period — that is, the value of work completed and billed to clients on existing contracts. The ratio is calculated by dividing new awards by revenue for the same period.

62. A book-to-burn ratio above 1.0 means a company is adding new work to its pipeline faster than it is completing old work — its backlog is growing. A ratio below 1.0 means backlog is shrinking. A sustained ratio below 1.0 signals that the company's future revenue will eventually decline, because the company is depleting its contracted work pipeline without adequate replenishment.

63. Backlog is the total dollar value of work a company has been contracted to perform but has not yet completed. It represents the company's pipeline of future revenue. Securities analysts and investors closely track the book-to-burn ratio for engineering and construction companies because it is one of the primary forward-looking indicators of whether the company's revenue trajectory is growing, stable, or contracting.

64. Throughout 2024 and 2025, including during the Class Period, Fluor and its executives repeatedly highlighted the book-to-burn ratio as a key metric for investors. Defendants discussed it on every quarterly earnings call. On February 18, 2025, Defendant Regan identified the full-year 2025 new-awards book-to-burn ratio as an assumption underlying the Company's FY

2025 EBITDA guidance of $575 to $675 million, stating: "Our assumptions include a new awards book to burn ratio well above 1." Defendant Constable echoed: "[W]e do see a book-to-bill significantly above 1 in 2025, just to emphasize that."

65. Fluor's FY 2024 consolidated new awards were $15.1 billion against revenue of $16.3 billion — a full-year book-to-burn ratio of approximately 0.93. FY 2024 new awards of $15.1 billion were down 23% from $19.5 billion in 2023. On the same February 18, 2025 earnings call where Defendants guided to a new-awards book-to-burn ratio "significantly" and "well above 1" for FY 2025, Defendant Breuer acknowledged that clients in the energy market — where new awards had collapsed 54% in FY 2024 — were delaying investment decisions: "[T]he clients in the energy market have been a little more careful and prudent in launching their FIDs [final investment decisions]." Breuer further conceded that the expected recovery in Energy Solutions awards was more likely to occur in 2026 than 2025: "2026 is a higher chance for sure than 2025." Despite acknowledging the existence of these factors, Fluor's FY 2025 guidance assumed that full-year book-to-burn would be "***significantly above 1.***" In other words, Defendants clearly signaled to investors that concerns about client behavior would not adversely impact Fluor's business. To the contrary, a book-to-burn forecast for full-year 2025 of "well above 1" constituted a dramatic reversal from the FY 2024 ratio of 0.93.

**E. Insider Sales and Executive Resignations**

66. Defendant Constable returned to Fluor in 2019 as a member of Fluor's Board after previously holding various leadership roles within Fluor between 1982 and 2011, including group president roles leading Fluor's Project Operations business. Thereafter, he was appointed CEO in January 2021 and was in that role from January 2021 through April 2025. On February 18, 2025, Fluor announced that Defendant Breuer would become CEO effective May 1, 2025 replacing Defendant Constable.

67. Shortly prior to Constable becoming CEO, Defendant Brennan was appointed as CFO and served in that role starting in July 2020. Just a few months before it was announced that Constable was leaving his position, on November 29, 2024, Fluor announced that Defendant Brennan would retire effective July 1, 2025 and cease to serve as CFO effective March 1, 2025.

68. Therefore, both Constable and Brennan left their roles as CEO and CFO during the Class Period.

69. Shortly after leaving his position as CEO, while still serving as Executive Chairman, Defendant Constable offloaded more than $11 million in Fluor stock, including more than $6 million in open market stock sales of Fluor. As detailed below, these three open market sales occurred in June and July 2025 while Fluor stock prices were inflated, shortly before the truth emerged and the stock price plummeted.

70. These open market stock sales were the first that Constable made since becoming CEO in 2021. As described in the Company's 2024 Form 10-K filed on February 18, 2025: "On November 16, 2024, David E. Constable, Chairman and Chief Executive Officer, adopted a 10b5-1 trading arrangement providing for the sale of up to 190,600 shares of common stock, subject to certain conditions, which will terminate on December 31, 2025." Therefore, Constable set up his 10b5-1 trading plan approximately three months prior to the February 2025 false and misleading statements alleged herein.

## V. THE TRUTH EMERGES

71. On August 1, 2025, during pre-market hours, Fluor issued a press release reporting its financial results for Q2 2025 (the "Q2 2025 Earnings Release"). Among other results, the Q2 2025 Earnings Release also provided a negatively revised financial outlook for FY 2025, guiding to adjusted EBITDA of $475 million to $525 million, down significantly from Defendants' prior guidance of $575 million to $675 million, and adjusted EPS of $1.95 per share to $2.15 per share,

down significantly from Defendants' prior guidance of $2.25 per share to $2.75 per share. Fluor's margin guidance for 2025 was reduced to 2.5% for the Urban Solutions segment.

72. Defendants blamed these disappointing results on growing costs in the Three Infrastructure Projects due to subcontractor design errors, price increases, and scheduling delays, as well as reduced capital spending by customers, stating, in relevant part:

> Urban Solutions reported a profit of $29 million in the second quarter compared to $105 million in the second quarter of 2024. ***Results reflect a $54 million net impact of cost growth and expected recoveries on three infrastructure projects, due to subcontractor design errors, the related schedule impacts, and price escalation***.

73. Defendant Breuer was quoted in the Q2 2025 Earnings Release as stating in relevant part: "***Unfortunately, our results for the quarter were impacted by three long-standing infrastructure projects and a shift in expected capital spending from some clients***."

74. In addition, Defendants' Class Period representations regarding Fluor's book-to-burn ratio and the health of the Company's pipeline proved unreasonably optimistic. In the Q2 2025 Earnings Release, Defendants also attributed the negative results and outlook, in part, to "***client hesitation around economic uncertainty and its impact on new awards and project delays and results for the quarter***."

75. Also on August 1, 2025, during pre-market hours, Fluor hosted an earnings call with investors and analysts to discuss the Company's Q2 2025 financial results. During the call, Defendant Breuer revealed that the infrastructure projects that had negatively impacted Fluor's Q2 2025 results were the Howe Bridge, I-635, and I-35 projects, stating in relevant part:

> [I]nfrastructure experienced cost growth on 3 projects during the quarter. ***On Gordie Howe, cost increase in the second quarter as we experienced rework and additional efforts required to hand over both ports of entry.*** This project is now 97% complete and we expect substantial completion this fall. ***The 635/LBJ project experienced cost***

> ***increases in construction materials as well as labor productivity impacts.*** This project is 78% complete with an expected substantial completion date in Q2 of 2026. Finally, ***on I-35 Phase 2***, ***the project experienced increased costs due to a subcontractor default, third-party utility delays and mitigation costs related to these delays.*** This project is 58% complete and targeting substantial complete in Q4 of 2026. To address the issues across these projects, we have increased operations oversight and strengthening the execution teams.

76. Defendant Breuer further stated:

> I would say that ***we're disappointed with the results in the quarter on these 3 projects***, as I said in my remarks, ***the impacts were caused for a variety of reasons, specifically limited to the three projects, whether it's design errors by third parties or material escalation or labor challenges.*** We are addressing very aggressively these issues and have taken actions both on the execution front and on the recovery from third parties. And yes, it is true that ***unfortunately, we are still experiencing some pain from projects that were bid many years ago with different pursuit principles and cover targets***.

77. The same day, Fluor filed its quarterly report on Form 10-Q, reporting the Company's financial and operating results for its quarter ended June 30, 2025 (the "Q2 2025 10-Q"). The Q2 2025 10-Q stated in relevant part:

> Urban Solutions. Segment profit in the 2025 Quarter and 2025 Period included ***forecast adjustments totaling $54 million (or $0.30 per share) for cost growth on 3 infrastructure projects related to subcontracted design errors, price escalation and schedule impacts*** partially offset by a refinement of our expected recovery from claims against our subcontractors on these projects.

78. The Q2 2025 10-Q also stated that "[e]arnings before taxes decreased during the 2025 Quarter and 2025 Period driven by cost growth on 3 infrastructure projects for subcontracted design errors, price escalation and schedule impacts."

79. Following these disclosures, Fluor's stock price fell $15.35 per share, or 27.04%, to close at $41.42 per share on August 1, 2025 on significant volume. *Bloomberg* reported that this was Fluor's biggest one-day drop in stock price in more than 24 years.

80. As further described *supra* (¶¶ 201-207), analysts tied the stock drop and negative performance directly to the financial and operational problems with the Three Infrastructure Projects and their impact on forecasted earnings, as well as a slowdown in customer spending and less than expected in new awards. For example, Barclays described the importance of the $54 million cost growth for those three projects in its August 1, 2025 report: "If we solely add $54mn of cost adjustments in infrastructure back, then it gets EBIDTA closer to $150mn (i.e. not too dissimilar to the last few quarters). …while Urban Solutions margin was 1.4%, vs. our 4.3% estimate. Adding back the $54mn cost growth charge would increase Urban Solutions margin to 4%, which would have been more in line with our estimate….The Adj. EBITDA midpoint change matched the cost growth in Urban Solutions." Barclays also noted that: "New awards were also lighter than expected; particularly in Urban.

## VI. <u>POST-CLASS PERIOD EVENTS</u>

81. The Three Infrastructure Projects continued to be an issue for the Company following the August 1 revelation that ends the Class Period.

82. In the Company's Q3 2025 Results earnings slides from November 7, 2025, Fluor disclosed, "Expect Gordie Howe, LAX Automated People Mover and 635/LBJ to reach substantial completion over next 3 quarters" and "I-35 Phase 2 nearing completion in late 2026."

83. On the Q3 2025 earnings call held on November 7, 2025, Defendant Breuer noted that the Company continues to pursue cost recoveries from clients and subcontractors but that "these efforts materialize on an extended timeline." Underscoring the speculative nature of any

recoveries is Breuer's reference to one example of a "favorable negotiation" that the Company had in 2025 for a project completed back in 2019.

84. On the Q4 2025 earnings call held on February 17, 2026, Breuer's prepared remarks noted:

> Urban Solutions reported a profit of $205 million for 2025, compared to $304 million a year ago. ***Segment profit reflects $108 million in cost growth on three infrastructure projects***, offset by $54 million of positive developments on other infrastructure projects, including a favorable negotiation on the project completed in 2019. ***Specific to our four infrastructure projects in the loss position, we are still on track to hand over three projects in 2026 and one in early 2027***, and we continue to aggressively pursue recoveries and change orders from clients and subcontractors.

85. Similarly, Regan's prepared remarks noted, "we recognized $108 million in cost growth across three infrastructure projects, including a $30 million effect during Q4."

86. On the same February 17, 2026 earnings call, Breuer was also asked about "the Urban Solutions margin outlook of 3% to 4% for 2026, I think in the past you have referenced a higher margin range." Breuer responded that, "nothing in the macro there that is causing that. As we had in the prepared remarks, we do have the legacy projects that are scheduled for handover. So it is pushing the finality of those out the door with maybe a little bit longer of a horizon than we had expected in earlier years. So it is really just the drag of those things here in the final stages."

## VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

87. Throughout the Class Period, Defendants made materially false and misleading statements and omissions, including: (i) concealing the vulnerability of Three Infrastructure Projects to cost overruns, subcontractor design errors, schedule impacts, and price escalation that would have a significant impact on the Company's financial guidance and operating performance, while at the same time touting Fluor's reimbursable backlog despite the fact that these major legacy projects were not reimbursable and (ii) touting the Company's book-to-burn ratio and backlog

despite client hesitation around economic uncertainty and the impact on new awards and project delays.

### A. Defendants' False and Misleading Statements Concerning the Three Infrastructure Projects

#### 1. February 18, 2025

88. The Class Period begins on February 18, 2025 when, prior to market opening, Fluor issued a press release reporting its fourth quarter and FY 2024 financial results, and held a conference call with analysts to discuss the Company's results. Fluor's February 18, 2025 press release provided financial guidance for FY 2025, stating, in relevant part:

> In consideration of the timing of new awards and the pace of execution on the existing backlog, ***we are establishing an adjusted EBITDA guidance for 2025 of $575 to $675 million and adjusted EPS of $2.25 to $2.75 per share***.

89. The same press release also quoted Defendant Constable as stating:

> Our results for 2024 reflect our four-year journey of ***building a robust reimbursable backlog across diverse end markets, strengthening our capital structure, developing strong engineering and project execution teams***, and commencing our capital allocation program. . . . ***These efforts have positioned Fluor to deliver significant value and opportunities for our clients, employees and shareholders.***

90. Also on February 18, 2025, Fluor hosted a conference call with investors and analysts to discuss the Company's Q4 and FY 2024 financial results. Each of the Individual Defendants participated in the conference call.

91. During his prepared remarks on the call, Defendant Breuer discussed Fluor's infrastructure projects in the Urban Solutions segment, stating, in relevant part:

> ***Our infrastructure business continues to make good progress on the Gordie Howe project. Construction is now 94% complete and handover of the U.S. port of entry is in progress. Substantial completion is targeted for Q3 of 2025***.

> …
>
> ***On the I-635 LBJ project, construction is now 70% complete. Substantial completion is forecasted for Q2 of 2026.***

92. In a February 18, 2025 slide presentation distributed to investors and referenced on the earnings call, Fluor stated: "***Gordie Howe International Bridge[:] 94% complete, Substantial completion date: Q3 2025***"; and "***635 LBJ[:] 70% complete, Substantial completion date: Q2 2026***."

93. On the February 18, 2025 earnings call, Regan stated: "Our expectations for 2025 segment margins are approximately 4% to 5% in Urban."

94. On the February 18, 2025 earnings call, Brennan stated: "We believe that these late-stage legacy projects will require up to $200 million of funding in 2025."

95. On the same call, Defendants Constable stated: "we have significant near-term prospects that will support further revenue growth…"

96. The same day, Fluor filed its 2024 Form 10-K with the SEC ("2024 10-K"), reporting the Company's financial and operating results for its Q4 and FY ended December 31, 2024.[2] With respect to the purported effectiveness of Fluor's risk management strategy, the 2024 10-K stated, in relevant part:

> We believe we have the ability to assess, mitigate and manage project risk, particularly in challenging locations or circumstances. Our experienced management and execution team employs a **systematic and disciplined approach** to identifying, assessing and managing risks. We believe that this risk management approach helps us control costs and adhere to clients' schedules.

[2] On March 7, 2025, Fluor filed an amended annual report on Form 10-K/A to include the consolidated financial statements of Fluor's equity investee, NuScale Power Corporation. Fluor stated in the amended 2024 10-K/A that this amendment did *not* modify or update in any way the consolidated financial position, results of operations, or cash flows of Fluor, or the disclosures in the originally filed 2024 10-K filed on February 18, 2025.

(Emphasis in original.)

97. Defendants' statements set forth above in ¶¶ 88-96 were materially false and misleading when made or omitted material facts necessary to render such statements not misleading. By choosing to speak about the Three Infrastructure Projects, Defendants had a duty to speak completely and accurately, including to disclose material facts necessary to make those statements not misleading. In these February 18, 2025 disclosures, Defendants gave no indication of the vulnerability of Three Infrastructure Projects to cost overruns, subcontractor design errors, schedule impacts, and price escalation that would have a significant impact on the Company's financial guidance and operating performance. In so doing, Defendants gave misleading financial guidance, including EBITDA and EPS, while also giving misleading margin expectations for the Urban Solutions segment.

98. With respect to Defendants' characterizations of the Three Infrastructure Projects — including statements that Howe Bridge had "good progress," "94% complete," and "handover of the U.S. port of entry is in progress," and statements that the I-635 was "70% complete" with substantial completion in Q2 2026— Defendants omitted material adverse facts that they knew or were severely reckless in disregarding. In addition, Defendants claimed that the legacy project will require $200 million of funding in 2025 and that there were "significant near term prospects that will support revenue growth." In fact, both the delay and associated costs were already materializing when Defendants made their false statements. As disclosed less than six months later, on August 1, 2025, Fluor incurred significant cost growth "due to subcontractor design errors, the related schedule impacts, and price escalation" on the three projects and admitted the need for "increased operations oversight and strengthening the execution teams." Thereafter, on

February 17, 2026, Fluor reported full-year 2025 cost growth on the Three Infrastructure Projects of $108 million.

99. Further, Defendants touted their "robust reimbursable backlog" yet omitted an explanation of the impact of Fluor's non-reimbursable current projects on the Three Infrastructure Projects.

100. In addition, the 2024 10-K represented that Fluor's "experienced management and execution team employs a systematic and disciplined approach to identifying, assessing and managing risks" and that "this risk management approach helps us control costs and adhere to clients' schedules." However, on the August 1 earnings call, Defendant Breuer stated: "To address the issues across these projects, we have increased operations oversight and strengthened the execution teams." If the existing oversight and execution teams required strengthening, then the 10-K's representation that the risk management approach was effective at controlling costs and adhering to schedules was misleading when made. Breuer further acknowledged on that earnings call that the projects were "bid many years ago with different pursuit principles and cover targets" — an admission that these projects were governed by risk standards that Fluor itself now considers inadequate, yet the 10-K's risk-management representation made no distinction between the Company's current approach and the inferior standards governing its three largest loss-position projects.

**2. April 2, 2025**

101. On April 2, 2025, Fluor held a Business Update Call with investors at the Eli Lilly project site in Indiana. Defendants Breuer and Regan both participated. On the call, Defendant Regan reaffirmed the Company's FY 2025 guidance, tying his assessment to his detailed evaluation of current conditions. He stated, "I'll remind you that in February we issued relatively

comprehensive guidance around what to expect for 2025. And as we sit here today, we don't see any inflections to what we had previously communicated."

102. On the same call, Defendant Regan quantified the remaining cash exposure on the three legacy infrastructure projects: "[F]rom January 2025 forward, that's about $225 million remaining to go on those projects. You should be thinking about that as roughly 85% funded in cal 2025 with the balance coming before mid — the middle of 2026."

103. Defendants' statements set forth above in ¶¶ 101-102 were materially false and misleading when made, or omitted material facts necessary to render such statements not misleading. By choosing to speak about the Three Infrastructure Projects, Defendants had a duty to speak completely and accurately, including to disclose material facts necessary to make those statements not misleading. Defendants also omitted material facts about the Three Infrastructure Projects, including the vulnerability of Three Infrastructure Projects to cost overruns, subcontractor design errors, schedule impacts, and price escalation that would have a significant impact on the Company's financial guidance and operating performance. On the April 2, 2025 call, Defendant Regan told investors the remaining cash exposure on the legacy projects was "about $225 million" with "roughly 85% funded in cash 2025." This was presented as a contained, managed wind-down with known costs. However, the conditions described above were already putting the $225 million estimate under pressure. On fixed-price projects such as the Three Infrastructure Projects, increases in the estimated cost to complete translate directly into additional cash the contractor must spend to finish the work. In Q2 2025 alone, Fluor recognized $54 million in cost growth on the Three Infrastructure Projects — a charge that reduced reported earnings and simultaneously signaled that the cost-to-complete (and therefore the cash required) was materially higher than previously estimated. Full-year 2025 cost growth on the Three Infrastructure Projects

totaled $108 million — nearly half of the entire $225 million remaining-cash figure Regan references. Regan himself effectively acknowledged this on the August 1, 2025 earnings call when stateing that the Company "now anticipate[d] some more funding in 2026 based on the revised project estimates." In other words, the cost growth had already pushed total cash needs beyond the $225 million that Regan had presented as the full remaining exposure just months earlier meaning the cost estimates underlying Regan's $225 million exposure figure proved materially inadequate.

**3. May 2, 2025**

104. On May 2, 2025, Fluor issued a press release reporting its financial results for Q1 2025. The press release reaffirmed the Company's financial guidance for FY 2025, stating in relevant part:

> Based on our current assessment of our backlog, the performance of our segments and the economic environment, the company is maintaining its adjusted EBITDA guidance for 2025 of $575 to $675 million and adjusted EPS of $2.25 to $2.75 per share.

105. In addition, the press release quoted Defendant Breuer as touting Fluor's purported ability to deliver on projects and drive substantial growth:

> We are well positioned for the grow and execute chapter of our Building a Better Future strategy. As we continue to deliver on our projects and take in quality backlog, we see substantial opportunities for growth in our key markets.…. Today, more than ever, clients can rely on Fluor's project delivery expertise to help navigate the complexities of the market.

106. The same press release also quoted Defendant Regan as touting Fluor's purportedly improved financial stability and reimbursable backlog, stating:

> ***Today we are on a much more solid footing financially***, supported by a majority reimbursable backlog and a robust outlook for cash generation.… As we transition to supporting growth in the business over the next strategic planning period, we aim to enhance operating margins through ***project execution excellence***, lean processes, and ***risk***

> ***management discipline, all while maintaining our commitment to return capital to shareholders***.

107. Also on May 2, 2025, Fluor hosted a conference call with investors and analysts to discuss the Company's Q1 2025 financial results. During his prepared remarks on the call, Defendant Breuer stated that the "***Gordie Howe project is now 96% complete, and we're on track to hand over the US port of entry in July***, getting us closer to our completion date this fall." In a May 2, 2025 slide presentation distributed to investors and referenced on the earnings call, Fluor also specified: "***Gordie Howe project 96% complete***."

108. Regan stated on the May 2, 2025 earnings call: "For our legacy infra projects, in Q1, we provided $70 million in funding…***Our expectation of funding about $200 million on legacy projects for all of 2025 remains unchanged***."

109. On the May 2, 2025 earnings call, Regan also disclosed, when discussing the first quarter slide presentation: "We also maintained our [Cal '25] segment margins of approximately 4% to 5% in Urban."

110. In response to a question by an analyst regarding Defendants' EBITDA guidance for the year, Defendant Regan reaffirmed guidance, stating in relevant part "***we remain confident in the outlook for the year***."

111. The same day, Fluor filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its Q1 ended March 31, 2025 (the "Q1 2025 10-Q"). The Q1 2025 10-Q represented that "[t]here have been no material changes from our risk factors as disclosed in the 2024 10-K."

112. With respect to the performance of Fluor's Urban Solutions segment, the Q1 2025 10-Q stated in relevant part:

> Segment profit increased in the 2025 Quarter due to an increase in execution activities on life sciences projects awarded in the last 18 months and a large metals project ***as well as a decrease in cost due to design optimization on a highway project***. We also recognized profit on a metals project upon a change in percentage of completion due to a reduction in scope. The increase in segment profit was partially offset by the effects of unfavorable foreign currency movements on an international bridge project. Segment profit margin in the 2025 Quarter was consistent with the 2024 Quarter.

113. Defendants' statements set forth above in ¶¶ 104-112 were materially false and misleading when made or omitted material facts necessary to render such statements not misleading. By choosing to speak about Three Infrastructure Projects, Defendants had a duty to speak completely and accurately, and to disclose material facts necessary to make those statements not misleading, including the vulnerability of Three Infrastructure Projects to cost overruns, subcontractor design errors, schedule impacts, and price escalation that would have a significant impact on the Company's financial guidance and operating performance.

114. In these collective May 2, 2025 disclosures, Defendants gave no indication of any financial difficulties, delays, or other problems specific to the Three Infrastructure Projects. Instead, Defendants reaffirmed the EBITDA targets and kept the cost to fund the legacy projects unchanged. Further, Defendants touted their reimbursable backlog yet did not explain the impact of Fluor's non-reimbursable Three Infrastructure Projects.

115. Defendant Breuer's statement on May 2, 2025 that the Howe Bridge project was "on track to hand over the US port of entry in July" was not true when made, and his statements about it being near completion were materially misleading. The handover did not happen in July and was not on track to do so at any point during the Class Period. The U.S. POE had been delayed already, the Canadian POE agency building handover (scheduled for June 30, 2024) and full handover (scheduled for September 20, 2024) had both been missed, and a liquidated-damages

waiver agreement had been negotiated — all documented in the S&P Global Ratings report dated April 28, 2025, four days before Breuer's statement. Moreover, even assuming a July 2025 handover of the U.S. POE — which Defendant Breuer represented on May 2, 2025 was "on track" — the bridge could not open to traffic by "this fall" as Breuer also represented. U.S. Customs and Border Protection ("CBP") requires approximately six months after handover to prepare a port-of-entry facility for operations, and the Canada Border Services Agency ("CBSA") requires approximately nine months. A July 2025 handover therefore implied a January 2026 opening at the very earliest — not fall 2025.

116. Just a month earlier, Regan described in detail on the April 2, 2025 Business Update Call the funding necessary to finish the projects. This shows that Regan was personally tracking the infrastructure project exposure to the dollar on April 2 — one month before reaffirming guidance on the above May 2 earnings call.

117. On August 1, 2025, Breuer disclosed that the project had experienced "rework and additional efforts required to hand over both ports of entry" — further confirming that the POE handover was not, in fact, "on track" when Breuer said it was. As of late July 2025, a WDBA spokesperson confirmed that basic construction activities — including drywall and flooring installation — were still underway at the POE facilities. A POE building that still required drywall installation in late July was not "on track" for a July handover or "nearly complete" when Defendant Breuer made that representation on May 2. Drywall and flooring are not final finishing items; they are fundamental building-interior work that must be completed before mechanical and electrical systems can be finished, inspections conducted, and formal handover achieved. As of March 2026, the bridge had still not opened to traffic.

118. With respect to I-635, Defendant Breuer disclosed on the August 1, 2025 Earnings Call that the project experienced "cost increases in construction materials as well as labor productivity impacts." During the Class Period, Defendants characterized I-635 as "70% complete" with "substantial completion forecasted for Q2 of 2026," and represented that Fluor's risk management approach "helps us control costs and adhere to clients' schedules." These characterizations omitted numerous ongoing problems, such as that the project had experienced six different Project Managers — reflecting chronic execution difficulties that senior executives necessarily knew about — and that the project was a lump-sum contract in a loss position, meaning Fluor bore the cost risk and any further cost growth would hit earnings immediately.

119. With respect to I-35, Defendant Breuer disclosed on the August 1 earnings call that in Q2 2025 the project experienced "increased costs due to a subcontractor default, third-party utility delays and mitigation costs related to these delays." A subcontractor default does not occur without warning. Defaults typically involve deteriorating performance, payment disputes, cure notices, and formal termination proceedings — a process that would have been tracked through the monthly reporting channels described below and that should have been disclosed.

120. Defendants' guidance was also misleading in light of the fact that the Three Infrastructure Projects were already in a loss position. The loss provision for projects in a loss position had increased $93 million over Q3-Q4 2024, increasing from $199 million on June 30, 2024 to $292 million on December 31, 2024, reversing a previously favorable trend, and management signed the 2024 10-K reflecting the $292 million provision figure on the same day they issued optimistic guidance. Under the loss-position accounting rules, any further cost growth on these projects would produce an immediate, full-quarter earnings charge. The risk of further cost growth was not speculative — it was probable, given the specific conditions then existing: the

Howe Bridge POE was well behind schedule with rework needed; I-635 had chronic labor productivity issues, six project managers, and material cost pressures; I-35 had a subcontractor heading toward default; the loss provision itself had increased in each of the prior two quarters; and the joint ventures were assembling claims against project owners — a step taken when the contractor believes costs have exceeded what the contract covers. Each of these was a concrete, known condition making additional cost growth likely, yet Defendants did not disclose this asymmetric risk to the $575-$675 million EBITDA guidance.

121. In addition, throughout the Class Period, Fluor's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations. Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required Fluor to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered." Defendants failed to disclose that costs associated with the Howe Bridge, I-635, and I-35 projects were growing because of subcontractor design errors, price increases, and scheduling delays. Defendants' failure to disclose the foregoing issues violated Item 105 because these issues represented material factors that made an investment in the Company speculative or risky.

122. Defendants also violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Fluor to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failure to disclose, *inter alia*, the issues described *supra* at ¶¶ 2, 12, 72-75, 87, violated Item 303 because

these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

123. Notably, Item 303 requires disclosure if the adverse impact on revenues or income from continuing operations is merely "likely" to occur. 17 C.F.R. § 229.303(b)(2)(ii). The adverse impact need not be a certainty. Thus, even before the Company experienced an adverse financial impact from subcontractor design errors, price increases, and scheduling delays, Defendants had a duty to disclose that Fluor's revenue and income was "likely" to be adversely affected as those problems began materializing in the field. Defendants made affirmative statements concerning the progress of the Howe Bridge, I-635, and I-35 projects, therefore they had a duty to disclose the adverse developments to avoid misleading investors. The affirmative statements were misleading half-truths.

124. The failure to disclose information required by Item 303 is actionable under Rule 10b-5(b) where an omission renders affirmative statements misleading. Defendants made affirmative statements about the Company's EBITDA, margins, financial outlook, and status of infrastructure projects — and those statements were half-truths that rendered the omission of the known adverse trend actionable. Once Defendants spoke about their assessment of ongoing infrastructure issues, they had a duty to disclose "material, firm-specific adverse facts that affect the validity or plausibility of that prediction" — not to continue to reaffirm financial guidance and claim infrastructure projects were on track.

125. Defendants' misleading statements and omissions led to the precise outcome Item 303 was designed to protect against: a surprise adverse impact on the Company's financial condition that investors had no means to foresee. Defendants' breach of the Item 303 disclosure duty is actionable conduct for purposes of Plaintiff's Exchange Act claims.

### B. Defendants' False and Misleading Statements Concerning Fluor's Book-To-Burn Ratio, Backlog

#### 1. February 18, 2025

126. On February 18, 2025, Fluor's full-year 2024 consolidated new awards were $15.1 billion against revenue of $16.3 billion — a full-year book-to-burn ratio of approximately 0.93. Full-year 2024 new awards of $15.1 billion were down 23% from $19.5 billion in 2023.

127. In the February 18, 2025 press release, Defendant Constable was quoted as stating:

> Our results for 2024 reflect our four-year journey of ***building a robust reimbursable backlog across diverse end markets, strengthening our capital structure, developing strong engineering and project execution teams****,* and commencing our capital allocation program. . . . ***These efforts have positioned Fluor to deliver significant value and opportunities for our clients, employees and shareholders.***

128. On the earnings call on February 18, 2025, Defendant Regan identified the full-year 2025 new-awards book-to-burn ratio as an assumption underlying the Company's FY 2025 EBITDA guidance of $575 to $675 million, stating: "Our assumptions include a new awards book-to-burn ratio well above 1, revenue growth of approximately 15%." Defendant Constable echoed: "[W]e do see a book-to-bill significantly above 1 in 2025, just to emphasize that." Constable also stated: "[W]e have significant near-term prospects that will support further revenue growth."

129. Defendants' statements set forth above in ¶¶ 126-128 were materially false and misleading when made, or omitted material facts necessary to render such statements not misleading. By choosing to speak about the book-to-burn ratio and backlog, Defendants had a duty to speak completely and accurately, including to disclose material facts necessary to make those statements not misleading, such as client hesitation around economic uncertainty and the impact on new awards and project delays.

130. Defendants' made the above book-to-bill disclosures despite acknowledging that clients in the energy market were being "a little more careful and prudent." Breuer further conceded that the expected recovery in Energy Solutions awards was more likely to occur in 2026 than 2025. Despite these acknowledgments, Defendants nonetheless issued the FY 2025 guidance on the assumption that the full-year book-to-burn would be "well above 1" even with these client concerns—a dramatic reversal from the FY 2024 ratio of 0.93.

**2. April 2, 2025**

131. During the question-and-answer session of the April 2, 2025 Business Update Call, an analyst asked how Fluor would navigate the tariff environment. In response, while at the same time reaffirming guidance, Defendant Breuer described Fluor's direct, real-time engagement with the clients whose investment decisions would determine whether the guidance was achievable: "We're working with our clients both on current backlog, but also on our key prospects. And oftentimes these key prospects, we're already on the project doing front-end work, supporting the clients towards our FID decisions. We're working [with] them closely through our supply chain expertise to look at which components of the projects are going to be affected, how they're going to be affected."

132. Defendant Regan was asked whether he is "reiterating the guidance of book to bill," which Regan responded, "Yeah, we said well above one….Yeah. So, you know, again, I don't think we saw anything through this exercise that caused us to pivot away from that same guidance."

133. Defendants' statements set forth above in ¶¶ 131-32 were materially false and misleading when made, or omitted material facts necessary to render such statements not misleading. By choosing to speak about book-to-burn ratio and backlog, Defendants had a duty to speak completely and accurately, and to disclose material facts necessary to make those statements

not misleading, including client hesitation around economic uncertainty and the impact on new awards and project delays.

134. Defendants reiterated the guidance and made clear that they assessed the tariff issues, and Defendants Breuer said, "short-term direct impact on us is fairly limited on tariffs."

**3. May 2, 2025**

135. On May 2, 2025, Fluor issued a press release reporting its financial results for Q1 2025 and, in part on the basis of booked contracts, reaffirmed financial guidance for FY 2025. The press release stated in relevant part:

> ***Based on our current assessment of our backlog***, the performance of our segments and the economic environment, the company is maintaining its adjusted EBITDA guidance for 2025 of $575 to $675 million and adjusted EPS of $2.25 to $2.75 per share.

136. Likewise, in that press release, Defendant Breuer amplified Fluor's backlog as an indicator of growth:

> We are well positioned for the grow and execute chapter of our Building a Better Future strategy. ***As we continue to deliver on our projects and take in quality backlog***, we see substantial opportunities for growth in our key markets.…. Today, more than ever, clients can rely on Fluor's project delivery expertise to help navigate the complexities of the market.

137. That same press release quoted Defendant Regan as touting Fluor's purportedly improved financial stability and reimbursable backlog, stating:

> ***Today we are on a much more solid footing financially***, supported by a majority ***reimbursable backlog*** and a robust outlook for cash generation…. As we transition to supporting growth in the business over the next strategic planning period, we aim to enhance operating margins through ***project execution excellence***, lean processes, and ***risk management discipline, all while maintaining our commitment to return capital to shareholders***.

138. On the same day, when an analyst noted a delay in a Fluor project involving Dow Corp. during Fluor's earnings call, Defendant Breuer stated in relevant part:

> Dow came out and very clearly explained the reasons for slowing down construction activities. They're not slowing down engineering and procurement. And it had to do with a combination of decisions around their market, the timing of the pricing of their products and so on.
>
> ***We don't think – we're not seeing a trend of that in our other clients…*** We have people who are having yet FID [final investment decision] projects are expect – or looking for further clarity and certainty. We're not seeing a trend. And because we're involved on these projects, and like [Defendant Regan] said, we're working hand-in-hand with our clients with these mitigation strategies around the tariffs and other factors.
>
> ***We feel pretty strongly about the quality of the backlog and our ability to convert. The exact timing of the conversion may be a little uncertain, maybe they push out just a tad, but we're not expecting significant underutilization compared to what the baseline was a month or two ago***.

139. In response to a follow-up to that question, Defendant Regan stated:

> I think a couple of points. One, just part and parcel of our execution strategy is an early buyout on the procurement front. ***So the things that are in backlog and ongoing tend to – it's our belief that they're going to continue moving forward.*** And then maybe [Defendant Breuer]'s prepared remarks was also hinting at kind of the earnings potential of the backlog. ***So, even as things are slowing down, we are performing work on the vast majority of the things we see coming. And so, from an earnings potential, kind of unmitigated there***, but obviously a ***little bit*** of disruption on the new award front.

140. When asked by an analyst "to further elaborate on [his] prepared remarks on [his] discussion with clients[,]" Defendant Breuer stated in relevant part:

> [W]e have been engaging with our clients at various levels, including the very senior levels of our key clients. And I would say that ***most of the projects in the markets we're tracking, the fundamentals of those***

> ***projects are still there. Whether it's the time-to-market projects****....* ***They're mostly in the Urban space****....* ***Those, for sure, are moving forward.*** But even the other ones that are more price sensitive and GDP growth and market certainty, those still have very sound fundamentals behind them. What those clients are looking for is certainty in the environment.

141. In response to another question by an analyst regarding Defendants' EBITDA guidance for the year, Defendant Regan stated in relevant part "***we remain confident in the outlook for the year***." Regan also reaffirmed that "***Key assumptions for '25 continue to include a new awards book to burn ratio above 1.***"

142. Defendants' statements set forth above in ¶¶ 135-41 were materially false and misleading when made, or omitted material facts necessary to render such statements not misleading. By choosing to speak about book-to-burn ratio and backlog, Defendants had a duty to speak completely and accurately, and to disclose material facts necessary to make those statements not misleading, including client hesitation around economic uncertainty and the impact on new awards and project delays.

143. Specifically, Defendants' book-to-burn statements were, in fact, false, misleading and made with severe recklessness. Defendants guided to a "new awards book-to-burn ratio well above 1" on February 18, 2025, reaffirmed that guidance on April 2, 2025, and reaffirmed it again on May 2, 2025 — when Defendant Regan stated "we remain confident in the outlook for the year" and that "[k]ey assumptions for '25 continue to include a new awards book to burn ratio above 1." In reality, Q2 2025 new awards of $1.8 billion against revenue of approximately $4.0 billion produced a single-quarter new-awards book-to-burn of approximately 0.45 — less than half the "above 1" threshold that Defendants had reaffirmed just weeks earlier. For the first half of 2025, new awards of $7.6 billion against revenue of approximately $8.0 billion produced a new-awards

book-to-burn of approximately 0.95 — below 1.0. Full-year 2025 new awards were $12.0 billion against revenue of $15.5 billion — a new-awards book-to-burn of approximately 0.77, dramatically below the "well above 1" guidance on which Defendants' FY 2025 EBITDA projection was expressly premised.[3] The deterioration was not sudden: by the time Defendants reaffirmed the "above 1" guidance on May 2, Q1 new awards were already down 17% year-over-year, Defendants had lost the multi-billion-dollar Dow project "in April," two large existing projects had been reduced in scope, and Defendants acknowledged they were "already engaged and providing services on over 90% of underlying award revenue" — giving them real-time visibility into the very pipeline they knew was failing to convert.

[3] Defendants' FY 2025 guidance was based on "a new awards book-to-burn ratio well above 1." Fluor's Form 8-K filed February 18, 2025 defines "new awards" as measuring "the total dollar value of work to be performed on contracts awarded in the period." Throughout the Class Period, Defendants reported book-to-burn as a dollar-denominated ratio. The Q1 2025 press release headline states "Q1 revenue book to burn ratio of 1.5x," and the ratio of reported new awards dollars to reported revenue dollars produces the ratios Defendants cited publicly. However, Defendants deceptively moved the goalposts when the ratio fell below 1. On August 1, 2025, when the dollar ratio had fallen below 1, Defendant Breuer reported the ratio with a "PGM" ("project gross margin") qualifier, stating that H1 2025 "new awards were $7.6 billion with a book-to-burn PGM above 1." On the subsequent Q4 2025 earnings call (February 17, 2026), Defendants reverted to the standard formulation without the PGM qualifier, with Breuer stating the Company anticipated "a book-to-burn ratio in excess of one" for 2026. The one-time insertion of the PGM qualifier coincided precisely with the period in which the unqualified dollar based ratio would have revealed the deterioration Defendants had been minimizing. On a dollar basis (the basis on which Defendants defined and reported the metric previously) H1 2025 new awards of $7.6 billion against H1 revenue of approximately $8.0 billion produced a new-awards book-to-burn of approximately 0.95, well below the "well above 1" guidance that Defendant Regan defined as a "new awards" metric. To be able to report a ratio that appeared to be "above 1," Defendants needed to either switch to a PGM-weighted calculation, which inflated the ratio relative to a dollar calculation, and/or to include project scope changes that were not new contract awards. Defendants did both. The 2025 H1 book-to-burn figure reported by Defendant Breuer was stated alongside $1.7 billion in "positive backlog adjustments for scope changes on existing reimbursable work" which were expansions to existing contracts. Including those adjustments in the numerator may inflate the ratio above 1.0, but they do not constitute "new awards" as Fluor's own SEC filings define that term.

144. Dow "slowing down construction activities," a decision Defendants learned of in April, removed one of Fluor's largest Energy Solutions prospects from the near-term pipeline. Despite this loss of a multi-billion-dollar prospect, Defendants reaffirmed the "well above 1" book-to-burn guidance on the same call.

145. Defendants reaffirmed this guidance notwithstanding the fact that Fluor reported Q1 2025 consolidated new awards of $5.8 billion, down 17% from $7.0 billion in Q1 2024 — a key metric underlying the book-to-burn ratio that Defendants had guided would be "well above 1."

146. On the same call, Defendant Breuer disclosed that Fluor had direct, real-time visibility into whether the awards underlying its guidance were materializing, stating in his prepared remarks: "Looking at our remaining new awards outlook for this year, we are already engaged and providing services on over 90% of underlying award revenue." This representation confirmed that Defendants were not merely forecasting future awards based on general market conditions; they were embedded on the very projects they expected to convert. When those projects subsequently did not convert to full awards — with Q2 new awards collapsing 43% year-over-year to $1.8 billion — Defendants' contemporaneous engagement on those prospects gave them real-time knowledge that the "well above 1" book-to-burn assumption was failing.

147. In addition, the declining trend in new client awards was a "known trend" to Defendants that was "reasonably likely to have a material unfavorable impact on net sales or revenues" under Item 303. While Defendants acknowledged certain individual manifestations of the trend, they simultaneously denied there was one. Q1 new awards were already down 17% year-over-year, Defendants had lost the multi-billion-dollar Dow prospect in April, two large existing projects had been reduced in scope, analysts were asking about tariffs and economic

concerns, and client hesitation around FIDs was broadening. Yet Breuer affirmatively told investors "we're not seeing a trend" in client behavior and Regan characterized the impact on earnings as "kind of unmitigated" with only "a little bit of disruption on the new award front." In the same breath, Defendants claimed they were embedded with clients and had insight into their pipeline and reaffirmed the FY 2025 EBITDA guidance of $575 to $675 million, which was based, in part, on a new-awards book-to-burn "well above 1." Item 303 required Defendants to describe the known trend and its reasonably likely impact, not to acknowledge isolated symptoms while denying the pattern and reaffirming flawed guidance the trend was already undermining. Defendants' statements were false and, at best, actionable half-truths that mislead investors.

## VIII. ADDITIONAL ALLEGATIONS OF SCIENTER

148. In addition to the facts discussed above, each of which is incorporated by reference, the following facts further support a strong inference of scienter, evidencing that Defendants knowingly or with severe recklessness made materially false and misleading statements and omissions to investors during the Class Period.

149. ***Actual Knowledge***. Defendants had actual knowledge of the misleading nature of the statements they made, or they acted in reckless disregard of true information known to them during the Class Period. Indeed, the Howe Bridge, I-635, and I-35 projects, which Defendants characterized as "long-standing" projects, were significant to the Company's Urban Solutions segment results—the segment which accounted for the largest portion of the Company's revenue and profit throughout 2024 and Q1 of 2025. Defendants were highly focused on this operating segment and these three projects during the Class Period, as demonstrated by the Defendants regularly and fluently speaking about these projects.

150. Information provided by former employees supports an inference of Defendants' actual knowledge of the fraud alleged herein, and thus establishes scienter. Former employees

described a host of independent channels through which detailed financial and operational information about the infrastructure projects flowed to senior management:

151. CW1, a former Communications Manager on the I-635 project, who worked at Fluor from September 2019 through January 2026, stated that the most significant operational concern they observed on the I-635 Project was the unusually high turnover of Project Managers. Six different Project Managers were assigned over the life of the project: Jason Estes, Larry Luke, Mike Lipinsky, Scott Risle, Steven Varnell, and Raul Malik. CW1 felt that the high turnover was unusual for a project of this scale, leading to inconsistent direction and shifting priorities. Senior executives necessarily approved each Project Manager assignment on a project of this magnitude.

152. CW1 also stated that executives were aware of the financial effects when the I-635 project's completion extended past 2024 because delays of that magnitude can carry substantial financial consequences, which CW1 understood were acknowledged by Project Managers who interfaced with senior leadership.

153. CW1 further stated that they were instructed by their Project Managers to continue messaging that the project remained active through 2024. They followed strict guidance on how information should be framed and who was authorized to speak on schedule-related matters. Schedule discussions were "highly politically sensitive."

154. CW1 stated that there were quarterly calls at the corporate executive level, and their supervisors participated in monthly board-style project meetings.

155. CW2, a former Finance Coordinator on the Howe Bridge, who worked at Fluor from October 2019 through April 2023, stated that Thomas Nilsson, the Infrastructure President, visited the Howe Bridge site monthly. According to CW2, Nilsson took at least two write downs

on the Howe Bridge project during Nilsson's "brief" tenure, and that, as CW2 described it, Nilsson "wanted to wipe the slate clean."

156. CW2 further stated that the write downs had to be approved by senior management at Fluor because they have to agree to take the loss by the end of the quarter. When asked if that meant the Fluor CFO knew of and approved each write-down, CW2 said yes. The requirement of CFO approval for each write-down confirms that the Company's most senior financial officer had direct, personal involvement in assessing and approving loss estimates on the infrastructure projects.

157. CW2 also stated that Terry Towle, the Urban Solutions President, came through the site and had meetings with department heads, including Josh Perry. At the meetings, Perry presented information that included updates on work progress and budget.

158. CW2 described monthly finance packages sent to corporate finance teams and a designated "need-to-know," including Robert Kick, Vice President of Operations. CW2 stated that Kick, as well as the rest of the executive committee, flew in every other month to view the progress and review costs and budget."

159. CW3, a former Quality Manager on the I-35 project who worked for Austin Bridge & Road, Fluor's joint venture partner on the project, from April 2024 through April 2025, described monthly meetings attended by VP- and director-level managers from both Fluor and Austin Bridge & Road. According to CW3, who reported directly to Fluor personnel, as the Company was clearly the lead on the project, those managers traveled to various projects to see the work being performed. These meetings included updates on financials.

160. ***Constable's Suspicious Insider Sales Support an Inference of Scienter***. During the Class Period, Defendant Constable had both the motive and opportunity to commit fraud. For

example, while Defendants were disseminating the materially false and misleading statements alleged herein to maintain an artificially inflated price for Fluor securities, Defendant Constable sold 119,400 shares of Fluor common stock in discretionary open market transactions, enriching himself by more than $6 million. His stock sales were as follows:

| **Date** | **Number of Shares Sold** | **Price per Share** | **Proceeds** |
|---|---|---|---|
| June 11, 2025 | 40,800 | $49.00 | $1,999,200 |
| June 16, 2025 | 40,000 | $50.15 | $2,006,000 |
| July 3, 2025 | 38,600 | $52.11 | $2,011,446 |
| | 119,400 | | $6,016,646 |

161. Defendant Constable did not sell any shares in open market transactions during the comparable 5.5-month pre-Class Period.[4] Accordingly, his sales during the Class Period were unusual relative to his pre-Class Period stock sale activity. In fact, Constable did not make any open market sales since becoming CEO in 2021.

162. Additionally, on March 6, 2025, Constable disposed of 143,756 shares at $36.58 per share for a total of $5,258,594. According to the Form 4, "In connection with the vesting of 114,793 restricted stock units and 260,824 performance units held by the Reporting Person on March 6, 2025, the Issuer has withheld 143,756 shares of common stock to satisfy the resulting tax withholding obligation."

163. As described in the Company's 2024 Form 10-K filed on February 18, 2025: "On November 16, 2024, David E. Constable, Chairman and Chief Executive Officer, adopted a 10b5-1 trading arrangement providing for the sale of up to 190,600 shares of common stock, subject to

[4] During the pre-Class Period, Defendant Constable sold 11,889 shares for total proceeds of $597,065 on December 23, 2024. That sale was in connection with the routine vesting of restricted stock units. Fluor withheld the 11,889 shares to satisfy tax withholding obligations related to the vested units. The withholding of these shares occurred automatically, and the sale was not an open market transaction.

certain conditions, which will terminate on December 31, 2025." Therefore, Constable set up his 10b5-1 trading plan approximately three months prior to the February 2025 false and misleading statements alleged herein. The timing of implementing this 10b5-1 plan was suspicious.

164. ***Incentive Compensation.*** The Company's performance-based stock compensation plan motivated Defendants Constable, Breuer, Brennan, and Regan to make the false and misleading statements and omissions at issue. Although Plaintiff need not allege any motive to plead a strong inference of scienter, the Individual Defendants were motivated to artificially inflate and maintain the inflation in Fluor's common stock price during the Class Period.

165. The Company's 2023, 2024, 2025, and 2026 Proxy Statements state that the Company "believes it is appropriate to tie a significant portion of executive compensation to the value of the Company's stock performance[.]" The Company's Proxy Statement filed in March 2025 stated in part that: "Our target compensation mix reinforces our commitment to pay-for-performance…. [I]n 2024, 90% of our CEO's [Constable's] target total direct compensation ("TDC") and an average of 75% of [certain other executive officers, including Breuer and Brennan's] target TDC was in the form of variable compensation, where realized pay depends on achievement of performance objectives and the Company's stock price performance."

166. The Company's most recent Proxy Statement filed in March 2026 confirmed that this remained the case throughout the Class Period: "Our target compensation mix reinforces our commitment to pay-for-performance…. [I]n 2025, 82% of our current CEO's [Breuer's] target total direct compensation ("TDC") and an average of 74% of [certain other executive officers and/or board members, including Regan, Brennan, and Constable's] target TDC was in the form of variable compensation, where realized pay depends on achievement of performance objectives and the Company's stock price performance."

167. The "variable compensation" component of the Individual Defendants' target total direct compensation in 2025 included a mix of restricted stock units ("RSUs"), performance-based equity awards ("Performance Awards"), and non-qualified stock options. Performance Awards granted in 2025 are based on achievement of earnings before taxes ("EBT") goals over three one-year periods,[5] as well as the Company's three-year cumulative total shareholder return ("TSR") relative to companies in the S&P 500 on the date of the award.

168. Relative TSR will be based on the three-year cumulative TSR over the three-year performance period (2025, 2026, 2027) relative to the companies in the S&P 500 Index on the date of the award, such that if the Company's final TSR ranks at the 25th percentile, 50th percentile or 75th percentile of the S&P 500, the Relative TSR performance measure will receive a performance rating of 0.5, 1.0 and 2.0, respectively. Therefore, the Company's stock performance relative to its peers directly impacts the amount of stock-based compensation to be awarded to the Individual Defendants. This provided the Individual Defendants with a motive to make the false and misleading statements and omissions at issue during the Class Period in order to artificially inflate and maintain the Company's stock price.

169. Defendant Constable's 2025 annualized base salary was initially set at $1,350,000. It was adjusted to $525,000 in May 2025 upon his transition to the role of Executive Chairman. In connection with his transition to the role of Executive Chairman in May 2025, the Company's Proxy Statement indicates that Constable also received a long-term incentive grant of $7,533,333, the value of which was granted as 35% RSUs, 15% in non-qualified stock options and 50% in

[5] The Performance Awards awarded to the Individual Defendants in 2025 are earned over a three-year performance period, which started on January 1, 2025, and ends on December 31, 2027. The awards are eligible to be earned based on actual performance during the three-year performance period, and will vest and be settled in shares in March 2028.

Performance Awards. Constable's grant reflected an annualized long-term incentive grant of $10,000,000 for his prior role as CEO (pro-rated for the four months he served in that role) plus $4,200,000 for his role as Executive Chairman. Constable's total compensation in 2025 was $10,525,488 according to the Company's 2026 Proxy Statement, comprised of $804,255 in base salary, $7,504,886 in stock awards, $1,130,014 in option awards, $963,500 in non-equity incentive plan compensation, and $122,833 of "all other compensation." Constable's total compensation in 2024 was $16,135,692 according to the Company's 2026 Proxy Statement, comprised of $1,350,045 in base salary, $10,119,428 in stock awards, $1,500,020 in option awards, $2,835,000 in non-equity incentive plan compensation, and $331,199 of "other compensation."

170. During the Class Period, Defendant Breuer's 2025 annualized base salary was initially set at $735,000. It was increased to $1,250,000 in May 2025 upon his promotion to CEO. In connection with his promotion to CEO, the Company's Proxy Statement indicates that Breuer also received a long-term incentive grant of $3,958,333, the value of which was granted as 35% RSUs, 15% in non-qualified stock options and 50% in Performance Awards. Breuer's grant reflects an annualized long-term incentive grant of $5,000,000 for his role as CEO (pro-rated for the eight months he served as CEO) and $1,875,000 for his prior role as COO (pro-rated for the four months he served in that role prior to his promotion to CEO). Breuer's total compensation in 2025 was $6,873,013 according to the Company's 2026 Proxy Statement, comprised of $1,071,689 in base salary, $2,744,569 in stock awards, $593,762 in option awards, $1,330,300 in non-equity incentive plan compensation, and $1,132,693 of "all other compensation."

171. During the Class Period, Defendant Regan's 2025 annualized base salary was set at $675,000. In connection with his promotion to CFO in March 2025, the Company's Proxy Statement indicates that Regan also received a long-term incentive grant of $1,400,000, the value

of which was granted as 35% RSUs, 15% in non-qualified stock options and 50% in Performance Awards. Regan's total compensation in 2025 was $2,678,131 according to the Company's 2026 Proxy Statement, comprised of $659,053 in base salary, $1,163,233 in stock awards, $210,035 in option awards, $573,300 non-equity incentive plan compensation, and $72,510 of "all other compensation."

172. During the Class Period, Defendant Brennan's 2025 annualized base salary prior to his retirement as CFO was set at $678,400. Brennan's total compensation in 2025 across base salary, stock awards, option awards, non-equity incentive plan compensation, and "all other compensation" was $1,585,453 according to the Company's 2026 Proxy Statement. This figure included $363,475 in stock awards and $222,080 for consulting work paid to Brennan post-retirement. Brennan's total compensation in 2024 was $3,191,385 according to the Company's 2026 Proxy Statement, comprised of $670,044 in base salary, $1,310,565 in stock awards, $210,014 in option awards, $895,900 in non-equity incentive plan compensation, and $104,862 of "other compensation."

173. The substantial value of the Individual Defendants' stock awards, as compared to their base salary, contributes to their motive to artificially inflate and maintain the Company's stock price.

174. In sum, the Company's incentive compensation provided a substantial motive for the Individual Defendants to artificially inflate the Company's stock price during and throughout the Class Period.

175. ***The Circumstances Surrounding the Departures of Constable and Brennan Supports an Inference of Scienter.*** The departure of Constable and Brennan shortly before the truth was revealed strengthens the inference of Defendants' scienter.

176. As discussed above, Defendants Constable and Brennan's departures occurred just a few months before Defendants' fraud was revealed.

177. Constable continued to serve as Chairman, but then informed the Board in March 2026 that he would not be stand for reelection to the Board.

178. ***Public Statements.*** The Individual Defendants' public statements during the Class Period, discussed *supra*, indicate that they had detailed knowledge of, or access to, the material facts and information misrepresented or concealed by Defendants, or that they were highly reckless in failing to investigate the very issues on which they spoke publicly.

179. The Individual Defendants repeatedly spoke – in detail – about the Urban Solutions segment during quarterly earnings calls with analysts, and they repeatedly reiterated their confidence in the financial guidance for 2025. For example, as discussed above, in response to a question from an analyst regarding Defendants' EBITDA guidance for the year, Defendant Regan stated on May 2, 2025: "we remain confident in the outlook for the year."

180. As discussed above, Defendants Constable, Breuer, and Regan spoke publicly about the Howe Bridge and/or I-635 projects on earnings calls during or shortly before the Class Period, indicating a familiarity with the status of the projects. Specifically, Defendant Constable discussed the Howe Bridge project on a November 11, 2024 earnings call. Defendant Breuer discussed the Howe Bridge and I-635 projects on a February 18, 2025 earnings call, and discussed the Howe Bridge project on a May 2, 2025 earnings call. Indeed, Defendant Breuer emphasized that the Howe Bridge project was 96% complete and the U.S. port would be finished in July 2025, with substantial completion in the fall of 2025. Defendant Regan discussed the Howe Bridge project on the May 2, 2025 earnings call.

181. The Individual Defendants also fielded questions about Fluor's expected performance, noting a delay in at least one project with Dow Corp., and Defendant Breuer stated, in relevant part, that Fluor was "not seeing a trend of that in our other clients… We're not seeing a trend. And because we're involved on these projects, … we're working hand-in-hand with our clients." Defendant Breuer described Fluor's "close collaboration with these clients on the front-end work."

182. Defendants Regan and Breuer would speak to analysts in detail regarding the accounting methodology used by Fluor. For example, on May 2 and August 1, 2025, Regan had a back and forth with the same analyst from Robert W. Baird discussing the complexities of accounting for the Urban Solutions projects. Also, Regan described in detail on the April 2, 2025 Business Update Call the funding necessary to finish projects. This confirmed that Regan was personally tracking the infrastructure project exposure on April 2 — one month before reaffirming guidance on May 2 — and presenting it to investors.

183. The Individual Defendants' frequent representations about these issues, including in response to direct questions from analysts, strengthens the inference of knowledge and scienter.

184. ***Control and Access to Information.*** The Individual Defendants' control over the entire Company and their access to material, nonpublic information supports a strong inference of scienter. The Individual Defendants oversaw the operations and financial reporting function at Fluor. In those roles, they had access to—and a duty to obtain—information relevant to the Company's operations.

185. Defendants Constable, Regan and Brennan signed the 2024 10-K issued during the Class Period, and Defendants Constable and Brennan signed Certifications attached to the 2024 10-K. The Certifications stated that Defendants maintained disclosure controls ensuring that

relevant information about the Company's operations was made known to them, stating: "The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures . . . for the registrant and have: (a) Designed such disclosure controls, or caused such disclosure controls and procedures to be designed under our supervision, ***to ensure that material information relating to the [Company]***, including its consolidated subsidiaries, is ***made known to us*** by others within those entities…."

186. Defendants Breuer and Regan both signed the same SOX Certifications in connection with the Company's Q1 2025 10-Q. Thus, the Individual Defendants had access to all material information about the Company's Howe Bridge, I-635, and I-35 projects.

187. ***Knowledge of the Industry.*** The Individual Defendants were intimately knowledgeable about complex infrastructure projects, including with respect to management, operations, and financial forecasting and reporting of such projects.

188. As described above, Defendant Constable has a long history with Fluor serving in many different roles prior to becoming CEO.

189. Likewise, Defendant Breuer has served as Fluor's CEO since May 1, 2025, before which he served as Fluor's COO. Defendant Breuer also held multiple other prior roles at Fluor throughout his thirty-one (31) years at the Company.

190. Defendant Regan has served as Fluor's CFO since March 1, 2025, before which he served as the Company's Chief Accounting Officer, joining Fluor in 2020 – several years before the start of the Class Period.

191. Defendant Brennan served as Fluor's CFO and Executive Vice President from before the start of the Class Period to March 1, 2025. Upon his retirement in 2025, Defendant Brennan had worked at the Company for approximately 34 years.

192. In their respective roles, the Individual Defendants gained expertise regarding complex infrastructure projects, including with respect to management, operations, and financial forecasting and reporting of such projects. This expertise contributes to the strong inference that the Individual Defendants knew or acted recklessly when making the false and misleading statements and omissions described herein.

193. Importantly, the Individual Defendants were knowledgeable about accounting and the issues associated with large, fixed price contracts. As described above, the Individual Defendants spoke often about these issues. Relatedly, Fluor was moving away from fixed price contracts and the Individual Defendants regularly discussed the Company's reimbursable backlog.

194. ***Core Operations.*** Defendants' misstatements concerned many of the most significant aspects and initiatives of Fluor's Urban Solutions business, its largest and most important segment. The misrepresentations and omissions alleged herein involve matters that were central to the Company's operations; they were not matters or projects that were merely tangential or peripheral to the Company's business. Given the importance of these issues and the three projects discussed herein, an inference exists that the Individual Defendants closely monitored these projects and their impact on Fluor's business.

195. ***Temporal Proximity.*** The temporal proximity between the Individual Defendants' false and misleading statements and omissions and the revelation of the truth concealed by those statements and omissions strengthens the inference of scienter. Throughout the Class Period, Defendants reaffirmed the Company's financial guidance for FY 2025 and made positive affirmative statements about the Howe Bridge, I-635, and I-35 projects despite having knowledge of adverse developments within those projects. The swift shift in messaging on August 1, 2025 supports a reasonable inference that the Individual Defendants were aware of the evolving

problems within those projects during the Class Period. Adverse events at three separate projects significant enough to trigger the largest stock price decline in 24 years do not develop overnight. Defendants were aware of the adverse events as they materialized but failed to disclose them.

196. ***History of Accounting Violations***. As described above, Fluor has a history of accounting violations involving similar issues as here. Fluor's wrongdoing took place from 2016 to 2019, and culminated on September 6, 2023 when Fluor entered into a settlement with the SEC and paid a $14.5 million fine in a matter involving improper accounting for cost overruns on large construction projects. *In the Matter of Fluor Corporation*, Administrative Proceeding File No. 3-21610, Securities Exchange Act of 1934 Release No. 98292 (Sept. 6, 2023).

197. In light of Fluor's violations concerning the timely recognition of cost overruns on large-scale constructions projects, the Individual Defendants would have been on notice and particularly aware of representations made about the forecasting of projects. Therefore, the Individual Defendants would have kept a particularly close eye on cost overruns in other projects going forward, including the Three Infrastructure Projects, further supporting a strong inference of scienter.

## IX. ADDITIONAL LOSS CAUSATION ALLEGATIONS

198. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiff and the Class.

199. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions. These statements and omissions artificially inflated or maintained the artificial inflation of the price of Fluor common stock.

200. On July 31, 2025, the last day of the Class Period, Fluor's stock price closed at $56.77. The next day, August 1, 2025, following the corrective disclosures, Fluor's stock price closed at $41.42, representing a 27.04% drop.

201. Securities analysts observed that Fluor's financial issues and stock decline were tied to the revelation of financial and operational problems with the Three Infrastructure Projects and their impact on forecasted earnings. In addition, analysts noted the issues with the book-to-burn ratio, with a slowdown in customer spending and less than expected new awards.

202. For example, a Morningstar report dated August 1, 2025 stated:

> Fluor's stock plunged 27% on Aug. 1 after management slashed its 2025 outlook, lowering its full-year adjusted earnings per share guidance to $1.95-$2.15 from $2.25-$2.75. Why it matters: The second quarter was full of bad news, ***including cost overruns*** . . . and a slowdown in customers' capital spending amid global trade policy uncertainty. . . . Fluor's second-quarter adjusted EBITDA fell 42% year over year to $96 million, ***as the company took a $54 million charge in the urban solutions segment driven by cost overruns on three infrastructure projects***.

203. A Truist report dated August 1, 2025 stated:

> Adjusted EBTIDA [sic] was $96M, below the consensus at $146M, ***which included $54 million of cost overruns on three infrastructure projects***. . . . Urban Solutions . . . operating profit was $29M compared to $105M last year and operating margin was 1.4%, down 430bps y/y. . . .
>
> FY2025 Guide Lowered: FLR lowered its 2025 guidance given the project charges in 2Q and a shift in capital spending by some customers.

204. A Bank of America Securities report dated August 4, 2025 stated, "FLR attributed the weak results in the quarter to cost overruns on three infrastructure projects and delayed capital spending timelines from some clients." It further noted:

> Projects stumble; Urban Solutions FY margins lowered. ***Urban Solutions was notably impacted by additional costs on three infrastructure projects: 1) Gordie Howe experienced increased costs on rework and additional efforts to hand over both ports of entry (97% complete, substantial completion expected this Fall), 2) 635 LBJ faced cost increases on construction materials and labor productivity***

> ***impacts (78% complete, substantial completion in 2Q26), and 3) I-35 Phase 2 was impacted by additional costs due to a subcontractor default, third party utility delays, and subsequent mitigation costs (58% complete, substantial completion in 4Q26)***. . . . As a result, FLR lowered its FY segment margin outlook for Urban Solutions to +2.5-3.5% (+4-5%).

205. A Truist report dated August 4, 2025 stated:

> On Friday, Fluor's stock closed down almost 30% on an earnings miss, a guidance cut . . . . ***The earnings miss and guidance cut was a disappointment to the market tied largely to three legacy infrastructure projects as well as a near-term slowdown in new awards***, reflecting macro/trade ware uncertainty.
>
> * * *
>
> Adjusted second quarter EPS was $0.43, below the consensus estimate of $0.56 ***reflecting cost overruns on three infrastructure projects***.
>
> * * *
>
> Urban Solutions segment profit was $29M and segment margins 1.4% compared to segment profit of $105M and segment margins of 5.7% last year. . . . ***The biggest negative was $54M or $0.30 in higher costs associated with three infrastructure projects including Gordie Howe, 635/LBJ and I-35 Phase 2***.
>
> * * *
>
> Urban Solution margins were reduced to 2.5-3.5% from 4.0-5.0% tied to cost overruns on the infrastructure projects.

206. Barclays described the importance of the $54 million cost overruns for the Three Infrastructure Projects in its August 1, 2025 report: "If we solely add $54mn of cost adjustments in infrastructure back, then it gets EBIDTA closer to $150mn (i.e. not too dissimilar to the last few quarters). …while Urban Solutions margin was 1.4%, vs. our 4.3% estimate. Adding back the $54mn cost growth charge would increase Urban Solutions margin to 4%, which would have been

more in line with our estimate….The Adj. EBITDA midpoint change matched the cost growth in Urban Solutions." Further noting, "Overall, a challenging print because of the legacy projects (again)."

207. Barclays also noted in the August 1, 2025 report that: "New awards were also lighter than expected; particularly in Urban."

208. The August 1, 2025 corrective disclosure also revealed the materialization of the foreseeable risks concealed by Defendants' fraud, specifically that the Three Infrastructure Projects would incur significant cost overruns and the book-to-burn ratio would falter.

209. As a result of their acquisition of Fluor common stock during the Class Period, Plaintiff and other members of the Class suffered economic losses when the price of the Company's stock fell in response to the corrective disclosure as described above.

## X. INAPPLICABILITY OF STATUTORY SAFE HARBOR

210. The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Amended Complaint. The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made. Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

211. Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an

executive officer of Fluor who knew that the statement was materially false or misleading when made.

## XI. PRESUMPTION OF RELIANCE

212. Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market prices for Fluor's common stock, and they are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

213. Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because throughout the Class Period Fluor shares traded in an efficient market, as evidenced by the following facts, among others:

(a) Fluor stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a registered issuer, Fluor filed periodic public reports with the SEC and the NYSE;

(c) Fluor was eligible to file registration statements with the SEC on Form S-3;

(d) Fluor regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e) The market reacted promptly to public information disseminated by and concerning Fluor; and

(f) Fluor securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace.

214. Under these circumstances, all purchasers of Fluor common stock during the Class Period suffered similar injury through their purchase of Fluor stock at artificially inflated prices, and the presumption of reliance applies.

215. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded in part on material omissions. Because this action involves a failure to disclose material adverse information regarding Fluor's business and operations – information that was required to be disclosed – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the facts withheld in this action, that requirement is satisfied here.

## XII. CLASS ACTION ALLEGATIONS

216. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class defined as all persons and entities that purchased or otherwise acquired Fluor common stock between February 18, 2025 and July 31, 2025, inclusive, and were damaged thereby. Excluded from the Class are Defendants and their immediate family members, directors and officers of Fluor during the Class Period, any entity in which Defendants had a controlling interest during the Class Period, and any affiliates of the Company.

217. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Fluor securities were actively traded on the New York Stock Exchange. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes there are hundreds or thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by Fluor or its transfer agent and may be notified of the

pendency of this action by mail or electronic means, using a form of notice similar to that customarily used in securities class actions.

218. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual Class members, include:

(a) whether Defendants violated federal securities laws;

(b) whether the prices of Fluor securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein;

(c) whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(d) whether the Individual Defendants caused Fluor to issue false and misleading statements during the Class Period;

(e) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and/or management of Fluor;

(f) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(g) whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(h) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(i) whether Defendants' conduct caused Class members to sustain damages; and

(j) the extent of damage sustained by Class members and the appropriate measure of damages.

219. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class purchased Fluor stock at artificially inflated prices and sustained damages from Defendants' wrongful conduct.

220. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation. Plaintiff has no interests which conflict with those of the Class.

221. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class members is impracticable. Additionally, the damages suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

222. The names and addresses of those persons and entities that purchased or acquired Fluor common stock during the Class Period are available from the Company's transfer agent(s) and brokerage and other business records. Notice may be provided to such purchasers and record owners via first-class mail, electronic notice, and publication using techniques and a form of notice similar to those customarily used in securities class actions.

223. As discussed *supra*, Plaintiff will rely in part upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Fluor securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold Fluor

securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

224. Based upon the foregoing, Plaintiff and Class members are entitled to a presumption of reliance upon the integrity of the market.

225. Alternatively, Plaintiff and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)

226. Plaintiff repeats and re-alleges each allegation above as if fully set forth herein.

227. By virtue of the foregoing, Fluor and the Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

228. Defendants violated Section 10(b) and Rule 10b-5 in that they: (i) employed devices, schemes, or artifices to defraud; (ii) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, or a course of business that operated as a fraud or deceit upon Plaintiff and the Class in connection with their purchases of Fluor common stock during the Class Period.

229. Defendants' conduct deceived Plaintiff and the Class, artificially inflated or maintained the artificial inflation in the market price of Fluor common stock and caused Plaintiff and the Class to purchase or acquire Fluor common stock at artificially inflated prices.

230. Defendants participated directly and indirectly in the preparation and issuance of false and misleading SEC filings, press releases, earnings call statements, and other statements set forth herein, which were designed to and did influence the market price of Fluor common stock. Such SEC filings, press releases, and statements were materially false or misleading in that they misrepresented the truth about: (i) the Three Infrastructure Projects; and (ii) the book-to-burn ratio.

231. Defendants acted with scienter in that they had actual knowledge of the misrepresentations and omissions as set forth herein or acted with severe recklessness in disregarding the truth in failing to ascertain and disclose the true facts even though such facts were available to them.

232. By virtue of the executive positions, the Individual Defendants had actual knowledge of the false and misleading statements and omissions or had access to such information. The scienter of the Individual Defendants, and other senior executives of the Company, is imputed on Fluor.

233. The Individual Defendants are liable directly and indirectly for the wrongs complained of herein. Because of their positions and control and authority, the Individual Defendants were able to, and did, directly or indirectly, control the content of the statements of Fluor.

234. As officers of a publicly traded company, the Individual Defendants had a duty to disseminate truthful and accurate information with respect to Fluor's financial condition and operations.

235. As a result of the dissemination of the misleading statements and omissions alleged herein the market price of Fluor common stock was artificially inflated throughout the Class Period.

236. Plaintiff and the Class suffered damages in that, in reliance on the integrity of the market price of the Company's securities, they paid artificially inflated prices for Fluor common stock. The artificial inflation was removed from the stock price when the true facts became known. Plaintiff and the Class would not have transacted in Fluor stock at the prices paid, or at all, if they had known the market price of the stock was artificially inflated due to Defendants' false and misleading statements and omissions.

237. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages attributable to the fraud in connection with their purchases and sales of Fluor common stock.

## COUNT II

### Violation of Section 20(a) of the Exchange Act (Against the Individual Defendants)

238. Plaintiff repeats and re-alleges each allegation above as if fully set forth herein.

239. By virtue of their positions as controlling persons of Fluor, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

240. The Individual Defendants controlled, directly or indirectly, the conduct of the Company with respect to the unlawful conduct alleged herein.

241. During the Class Period, the Individual Defendants participated in the operation and management of Fluor and participated, directly and indirectly, in the conduct of Fluor's business affairs. The Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct alleged herein. In their capacities as senior officers, the Individual Defendants had direct involvement in the day-to-day operations of the Company and had the power to control

or influence the policies and practices giving rise to the false and misleading statements and omissions alleged herein.

242. The Individual Defendants were able to, and did, control the contents of the various SEC filings, press releases, and earnings call statements disseminated to the market during the Class Period. They also controlled other personnel who had roles in preparing or disseminating the false and misleading statements alleged herein.

243. The Individual Defendants spoke regularly and prominently on the Company's earnings calls and at investor conferences, making the misrepresentations and omissions set forth herein.

244. Defendants Constable, Brennan, and Regan signed the Company's 2024 10-K issued during the Class Period, and Defendants Constable and Regan further signed Certifications attached to the 2024 10-K certifying that the annual report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and, that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

245. Defendants Breuer and Regan signed the same SOX Certifications in connection with the Company's Q1 2025 10-Q.

246. During their tenures as senior officers, each of the Individual Defendants was a "controlling person" of Fluor within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

247. The Individual Defendants participated in and controlled the actionable conduct alleged herein, which artificially inflated the market price of Fluor common stock.

248. As a direct and proximate result of the Individual Defendants' wrongful conduct as controlling persons, Plaintiff and the Class suffered damages in connection with their purchases of Fluor common stock during the Class Period.

249. By reason of the above conduct, the Individual Defendants are liable jointly and severally pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## COUNT III

### Violation of Section 10(b) and 20A of the Exchange Act and Rule 10b-5 Promulgated Thereunder for Insider Trading (Against Constable)

250. Plaintiff repeats and re-alleges each allegation above as if fully set forth herein.

251. This Count is asserted for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) on behalf of Plaintiff and all other members of the Class who purchased shares of Fluor common stock contemporaneously with the sale of Fluor common stock by Defendant Constable while he was in possession of materially non-public information ("MNPI") as alleged herein.

252. Section 20A(a) of the Exchange Act provides that "[a]ny person who violates any provision of the [Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased securities of the same class."

253. As set forth herein, Defendant Constable violated Exchange Act Section 10(b), Rule 10b-5 and Section 20(a) for the reasons stated in Counts I and II above. Additionally, Defendant Constable further violated Exchange Act Section 10(b), Rule 10b-5, and Rule 10b5-1

(17 C.F.R. § 240.10b5-1) by selling shares of Fluor common stock while in possession of MNPI concerning the true state of the Three Infrastructure Projects and book-to-burn ratio, as alleged herein, which information they had a duty to disclose, and which they failed to disclose in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as more fully alleged herein.

254. Contemporaneously with Defendant Constable's insider sales of Fluor common stock on June 11, 2025 and June 16, 2025, Plaintiff purchased shares of Fluor common stock on a national securities exchange while Defendant Constable was in possession of MNPI as alleged herein.

255. Other Class members also purchased shares of Fluor common stock contemporaneously with Defendant Constable's insider sales of Fluor common stock.

256. Plaintiff and other members of the Class have been damaged as a result of the violations of the Exchange Act alleged herein.

257. By reason of the violations of the Exchange Act alleged herein, the Exchange Act Defendants are liable to Plaintiff and other members of the Class who purchased shares of Fluor common stock contemporaneously with Defendant Constable's sales of Fluor common stock during the Class Period.

258. Plaintiff and the other members of the Class who purchased contemporaneously with Defendant Constable's insider sales of Fluor securities sales seek disgorgement by Defendant Constable of profits gained or losses avoided from Defendant Constable's transactions in Fluor common stock contemporaneous with Plaintiff and other members of the Class.

259. This action was brought within five years after the date of the last transaction that is the subject of Defendant Constable's violation of Section 20A, and, with respect to the

underlying violations of Section 10(b) of the Exchange Act alleged in this Count and in Count One above, was brought within five years after the date of the last transaction that violated Section 20A of the Exchange Act by Defendant Constable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such equitable/injunctive or other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 31, 2026

Respectfully Submitted,

*/s/ Joe Kendall*

Joe Kendall
Texas Bar No. 11260700
KENDALL LAW GROUP, PLLC
3811 Turtle Creek Blvd., Suite 825
Dallas, Texas 75219
Tel: (214) 744-3000
Fax: (214) 744-3015
jkendall@kendalllawgroup.com

***Local Counsel for Lead Plaintiff and the Proposed Class***

BERGER MONTAGUE PC
Michael Dell'Angelo (*pro hac vice* pending)
Andrew Abramowitz (*pro hac vice* forthcoming)
Alex B. Heller (*pro hac vice* forthcoming)
Kyle A. Jacobsen (*pro hac vice* forthcoming)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bergermontague.com
aabramowitz@bergermontague.com
aheller@bergermontague.com
kjacobsen@bergermontague.com

THE SCHALL LAW FIRM
Brian Schall (*pro hac vice*)
Andrew Brown (*pro hac vice*)
William M. Brody (*pro hac vice*)
Adam Rosen (*pro hac vice*)
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Tel: (310) 301-3335
Fax: (213) 519-5876
brian@schallfirm.com
andrew@schallfirm.com
wbrody@schallfirm.com
adam@schallfirm.com

***Co-Lead Counsel for Lead Plaintiff and the Proposed Class***

**CERTIFICATE OF SERVICE**

I hereby certify that on March 31, 2026, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Joe Kendall*
Joe Kendall